**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In the Matter of<br><br>**JAMES R. SILVER, as owner of the M/V SEA-RENITY NOW (O.N. 1212716), A 1963 (2021) Bertram 31 Flybridge Cruiser Sport Fisherman, for Exoneration from or Limitation of Liability.** | **Civil Action No.: 1:22-CV-11833-IT**<br><br>**In Admiralty** |
| **JAMES R. SILVER,**<br>　　　　　　**Counterclaim Plaintiff**<br>**v.**<br>**KAISER YACHTS, LLC,**<br>**MATTAPOISETT BOATYARD, INC.**<br>**And MBY REALTY TRUST**<br>　　　　　　**Counterclaim Defendant.** | |

**PETITIONER/COUNTERCLAIM PLAINTIFF'S OPPOSITION TO CLAIMANTS/COUNTERCLAIM DEFENDANTS, MATTAPOISETT BOATYARD, INC., KAISER YACHTS, LLC AND MBY REALTY TRUST'S MOTION TO DISMISS FOR LACK OF SUJBECT MATTER JURISDICTION**

Now Comes Petitioner/Counterclaim Plaintiff, James R. Silver ("Silver") as owner of the

M/V SEA-RENITY NOW (O.N. 1212716), a 1963 (2021) Bertram 312 Flybridge Cruiser Sport

Fisherman ("Vessel") to oppose Claimants/Counterclaim Defendants, Mattapoisett Boatyard,

Inc., Kaiser Yachts, LLC and MBY Realty Trust's ("Yard") motion to dismiss for lack of subject

matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1).

**<u>INTRODUCTION</u>**

The Petitioner entered into a verbal maritime contract with the Yard to make repairs to

Petitioner's Vessel. *See Document No. 1, Verified Complaint ("VC") ¶6; see also Document*

*No. 44, Counterclaim ("CC") ¶¶11-13.* The Yard decided to make those repairs by hauling the

Vessel out of the water.  While making those repairs, the Yard's personnel breached the implied warranty of workmanlike performance by igniting the fire.  After those adverse actions by the Yard, it now asserts that the Petitioner as a vessel owner does not get the benefit of the Limitation Act because the Vessel was out of the water.  That is simply not correct.  Further, the Yard totally ignores the jurisdictional basis as further spelled out in the counterclaims.

## **FACTS**

On August 3, 2022, Silver had issues starting the motors of his Vessel.  *See Verified Complaint ("VC") ¶5.*  On August 6, 2022, Silver spoke with Ned Kaiser ("Ned") who is the Service Manager for the Yard.  During that conversation Silver told Ned that he wanted a temporary fix or quick turn-around permanent repair so Silver could continue to use his Vessel.  Ned told him that the turn around time with either a temporary tank or permanent tank was two weeks.  *See Exhibit A, Affidavit of James Silver.*  On August 8, 2022,  Silver again told Ned that he wanted a temporary fix to get through the summer.  Further, Silver informed Ned that he had tank measurements for purposes of manufacturing a replacement tank.  *Id.*

On August 10, 2022, Silver had his Vessel towed to the Yard.  The Yard decided to haul the Vessel out of the water.  *Id.*

On August 12, 2022, Silver talked to Ned again about installing a temporary low profile fuel tank that could be installed on deck under the aft bench seat while a tank was being manufactured.  *Id.*  On August 15, 2022, Silver provided the updated dimensional drawings to the Yard for purposes of manufacturing the tank.  *Id.*

On August 19, 2022, Silver stopped by the Yard to check on the progress.  It was unclear to Silver whether or not the temporary tank was to be installed or whether the new tank was going to be installed.  Before he left, Silver told the Yard's employee to use a handsaw to cut the

foam that was holding the tank in place.  That employee stated that the yard had plenty of handsaws.  When Silver left the yard that day, he expected to have his boat returned to him by August 24, 2022.  *Id.* Later that day, an employee of the Yard used a power tool to remove the fuel tank from the Vessel.  *VC at ¶8.*  During that process an explosion occurred destroying the Vessel as well as much of the Yard.  *VC at ¶9.*

It should be noted that the fire spread upland in large part due to the wind direction as can been seen on various news videos.   Additionally, Vessels were towed from at least one location either due to risk of loss or to allow a rescue boat with fire pump capabilities into the berth so that it could spray water on the fire.  There were rescue boat with fire pump capabilities on scene that were not available for use for other rescue services at the time.[1]  Clearly, there was an impact to vessels on the water as they had to be moved and others called in to deal with the fire taking them away from other vessels that may need assistance.  Also, as demonstrated on the video, other vessels were waiting to be hauled for repairs.  Those vessels clearly did not get the service they were seeking.

Claims as set forth in Kaiser's affidavit are eight (8) buildings, forty-seven (47) cars, three (3) houses and twenty-eight (28) boats and miscellaneous property.  *See Document No. 54-1.*

---

[1] These news videos depict the fire, the movement of boats away from the fire and the rescue vessels putting water on the fire:  https://www.youtube.com/watch?v=3ewzsYKigTE   https://www.youtube.com/shorts/g9xuWM5B-hE https://www.youtube.com/shorts/kup2H5-1wLQ https://www.youtube.com/shorts/DVDNi2M3gps https://www.youtube.com/watch?v=qzWa3htuvEQ https://www.youtube.com/watch?v=AqTFQCP99aU https://www.facebook.com/watch/live/?ref=watch_permalink&v=536353881510227

## ARGUMENT

### I. STANDARD OF REVIEW

Under Fed. R. Civ. P. 12(b)(1), a defendant may move to dismiss a complaint for lack of subject matter jurisdiction. "[T]he party invoking the jurisdiction of a federal court carries the burden of proving its existence." *Murphy v. United States*, 45 F.3d 520, 522 (1st Cir. 1995) (quoting *Taber Partners, I v. Merit Builders, Inc.*, 987 F.2d 57, 60 (1st Cir. 1993)) (internal quotation marks omitted). When confronted with such a motion, "the district court must construe the complaint liberally, treating all well-pleaded facts as true and indulging all reasonable inferences in favor of the plaintiff." *Aversa v. United States*, 99 F.3d 1200, 1209–10 (1st Cir. 1996) (citing Murphy, 45 F.3d at 522). The Court, however, may widen its gaze and look beyond the pleadings to determine jurisdiction. *Martínez-Rivera v. Puerto Rico*, 812 F.3d 69, 74 (1st Cir. 2016).

Where a counterclaim states a cause of action seeking affirmative relief independent of that stated in the complaint, dismissal of the complaint does not preclude a trial and determination of the issues presented by the counterclaim. *Switzer Brothers v. Chicago Carboard Co.*, 252 F.2d 407 (7th Cirt. 1958). Further, once an issue with independent subject matter jurisdiction is before the court and jurisdiction over the parties has been perfected, it must be allowed to proceed to a conclusion pursuant to rules of civil procedure like any other routine federal claim. *National Research Bureau, Inc. v. Bartholomew*, 482 F.2d 386 (3rd Cir. 1982).

### II. CLAIMS PRESENTED VIA THE PETITION AND COUNTERCLAIMS

Both the Verified Complaint and the Counterclaim plead Admiralty jurisdiction pursuant to 28 USC §1333. The Verified Complaint contains one count for Exoneration from and/or Limitation of Liability pursuant to 46 USC §30501, et. seq. The general limit of liability for a

vessel owner for any claim is not to exceed the value of the vessel and pending freight. *See* 46 USC §30505(a). The statute continues to allow the vessel owner to limit all claims "any loss, damage … or any act, matter, or thing, … done, occasioned, or incurred, without the privity or knowledge of the owner." 46 USC §30505(b). These statutes apply to any claim and to any loss or damage done without the privity or knowledge of the owner. Claimants assert there is no jurisdiction for this Petition.

However, Claimants are completely silent on the counterclaim where admiralty jurisdiction is more specifically plead. The Counterclaim contains seven counts: negligence, breach of contract, bailment, breach of warranty, breach of workmanlike conduct, indemnity and contribution.

Under maritime law, "a shipowner may sue in either tort or contract for negligent repairs to his vessel." *La Esperanza De Inc. v. Perez Cia De Puerto Rico Inc*., 124 F.3d 10, 16. This concept is well-entrenched in the First Circuit:

> The First Circuit has acknowledged three potential sources of liability under federal maritime law for a ship repairer's infelicitous work. These are liability via expressly assumed contractual obligations, the maritime tort of negligence, and the "implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956)."

*Fairest-Knight v. Marine World Distributors*, 652 F.3d 94, 101 (1st Cir. 2011).

The law of maritime bailment is applicable in suits for damages to or loss of a vessel which has been left with another for the purposes of storage or repair. *Chanler v. Wayfarer Marine Corp.,* 1969 AMC 1435, 1439 (D. Me 1969). See also *National Union Fire Insurance Company of Pittsburgh, PA*., *as subrogee of Star of America Charters, v. Garpo Marine Services, Inc*., No. 17-3286 citing *Goudy & Stevens, Inc. v. Cable Marine, Inc*., 924 F.2d 16, 18 (1st Cir. 1991)(A bailment is "the delivery of goods by their owner to another for a specific

purpose, and the acceptance of those goods by the other, with the express or implied promise that the goods will be returned after the purpose of the delivery has been fulfilled.").

The Supreme Court has approved a nonstatutory federal right for vessel owners to obtain contribution from another tortfeasor jointly responsible for causing harm. *See Cooper Stevedoring Co. v. Fritz Kopke, Inc.,* 417 U.S. 106, 94 S.Ct. 2174, 40 L.Ed.2d 694. While this is an oral maritime contract for repairs, there is admiralty jurisdiction over implied contract and tort indemnity. *See Araugo v. Woods Hole, Martha's Vineyard, Nantucket S.S. Autho.*, 693 F.2d 1, 1983 AMC 3271 (1st Cir. 1982).

There can be no dispute the Court has admiralty jurisdiction over the Counterclaims. These Counterclaims could have been brought in this Court as a separate but related action. The Court would also have jurisdiction to the extent that the claims were controlled by Massachusetts law as the parties in the Counterclaim are diverse and the amount in controversy satisfy 28 USC §1332. Additionally, the Court would have supplemental jurisdiction over any of the Counterclaims that are not subject to Admiralty jurisdiction under 28 USC §1367 as all of the Counts are based on the same operative facts. *See Exter Shipping Limited v. Kilakos*, 310 F.Supp.2d 1301, 2004 AMC 1449 (2004).

### III.   ADMIRALTY JURISDICTION EXISTS FOR THIS MATTER

#### 1.   The Limitation Act Provides Independent Admiralty Jurisdiction

Claimant's motion cites a number of federal Circuit Court cases, contending that the Limitation Act "does not provide an independent basis of federal subject matter jurisdiction" when 28 U.S.C. § 1333 is not satisfied. But even *In re Carter*,743 F.Supp.2d 103 (2010) does not so state, instead conceding that under *Richardson* "it is undeniable that the Limitation Act confers admiralty jurisdiction independent of 28 U.S.C. § 1333 in *some* circumstances" while also presuming "that *Richardson* remains good law." *Carter*, 743 F.Supp.2d at 108 and n.4; *see also Houseboat Starship*

6

*II Limitation Proceedings*, 2006 AMC 1335, 2005 WL 3440788 (M.D. Tenn. 2005) (citing *Richardson*, the Limitation Act "provides an independent basis for subject matter jurisdiction 'whether the liability be strictly maritime or from a tort non-maritime'"); *Bernstein*, 81 F.Supp.2d at 182 ("this Court concludes that it has no choice but to heed the rule of *stare decisis* and follow *Richardson*"); *In re Colonial Trust Co.*, 124 F. Supp. 73, 78 (D. Conn. 1954) (Limitation Act is "an independent head of jurisdiction" and "applies to non-maritime as well as maritime torts"); *The TRIM TOO*, 39 F. Supp. 271, 273 (D. Mass. 1941) (same); *The IRVING F. ROSS*, 8 F.2d 313, 314 (D. Mass. 1923) (same).

Also, in *Sisson v. Ruby*, 497 U.S. 358, 359 n.1 (1990), the parties there argued whether the Limitation Act independently provides subject matter jurisdiction but the Court did not rule on that issue, leaving *Richardson* as continuing Supreme Court precedent.

Leading commentators, as did *Bernstein*, 81 F.Supp.2d at 181, view *Richardson* as controlling *stare decisis*. *See* C. Davis, *Maritime Law Deskbook* at 441 (2013 Supp.) ("**Application of Limitation of Liability Act to Claims Involving Casualties Not Within Admiralty Jurisdiction**…. It appears that all appellate courts that have considered the issue have ignored the precedent of *Richardson*"); S. Friedell, 1 *Benedict on Admiralty*, § 225 (7th ed. 1999 Supp.) ("Proceedings by vessel owners to limit their liability as permitted by the Acts of Congress are within admiralty jurisdiction even if the claims limited against might not be sued upon in admiralty"); G. Gilmore & C. Black, *The Law of Admiralty*, § 10-13 at 846 (2d ed. 1975) ("The hornbook law of the matter today is that [46 U.S.C. § 30505, not amended since 1884]: (1) extended the Limitation Act to cover non-maritime claims…"); *but cf.* T. Schoenbaum, 2 *Admiralty and Maritime Law*, § 15-8 at 201 n.12 (5th ed. 2014-15 Supp.) (cites *Richardson* but on a different issue).

At issue in *Richardson* was an allision to a bridge by a barge on navigable waters such that the shoreside tort was nonmaritime.[2]  *Carter* suggests *Richardson* should be limited to those facts, *Carter*, 743 F.Supp.2d at 111, but *Richardson's* holding is broad.

*Richardson*, 222 U.S. at 101 and 106-07, addressed a prior case, *Ex parte Phenix Ins. Co.*, 118 U.S. 610 (1886), which held the Limitation Act before its 1884 amendment by 46 U.S.C. § 30505's predecessor did not independently provide subject matter jurisdiction, 118 U.S. at 619. *Richardson* emphasized *Phenix* involved an 1880 casualty so that the 1884 amendment did not retroactively apply. *Richardson*, 222 U.S. at 107. However, in the *Richardson* allision the 1884 amendment did apply, statutorily adding "'any and all debts and liabilities,'" which *Richardson* construed broadly, regardless of "whether the liability be strictly maritime or from a tort nonmaritime." *Richardson* then reversed *Phenix* and held the owner can apply "for the benefit of such limitation to the proper district court of the United States." Furthermore, *Richardson* was not limited factually "to a collision between the ship and a structure upon land," stating that only is "one in respect" of the types of tort that an owner can limit. *Id*. at 105-06.

In sum, except for the Limitation Act, subject matter jurisdiction was otherwise lacking in *Richardson* which continues to stand for the proposition that the Limitation Act -- specifically 46 U.S.C. § 30511(a) and § 30505(a) -- independently confers admiralty jurisdiction even over nonmaritime torts. *See generally Bernstein*, 81 F.Supp.2d at 180-82 (discusses *Phenix* as reversed by 1884 amendment and *Richardson*) and at 181-82 (why Circuit Courts erred in ignoring *Richardson*).

## 2.    The Limitation Act Constitutionally Includes Nonaritime Torts

Without argument from either party, *Carter* raised "a constitutional difficulty" with the Limitation Act and got confused assessing it. 743 F.Supp.2d at 113. Congress has on other occasions besides the Limitation Act's 1884 amendment extended admiralty jurisdiction beyond

---

[2] This was before the Admiralty Extension Act of 1948, 46 U.S.C. § 30101(a).

earlier confines and *Carter* is wrong to the extent it suggests "the federal court's admiralty jurisdiction" is statutorily only "embodied in [28 U.S.C.] § 1333(1)." *Carter*, 743 F.Supp.2d at 113.

The Ship Mortgage Act of 1920, 46 U.S.C. §§ 31301-30, transformed nonmaritime security in nonmaritime transactions (*e.g.*, a mortgage[3] on the construction[4] or sale[5] of a vessel -- none of which traditionally are subject to admiralty jurisdiction) and legislatively made ship mortgages part of admiralty jurisdiction for the first time. That also expanded admiralty's geographic reach, such that a vessel now could be arrested by the U.S. Marshal for default of its preferred ship mortgage even "next to a babbling brook" in Sterling.  *See generally The Law of Admiralty*, § 9-49 at 694, *quoting Detroit Trust Co. v. The THOMAS BARLUM*, 293 U.S. 21 (1934), in which a unanimous Court upheld the constitutionality of the Ship Mortgage Act of 1920:

> The framers of the Constitution did not contemplate that the maritime law should remain unalterable. The purpose was to place the entire subject, including its substantive as well as its procedural features, under national control. From the beginning the grant was regarded as implicitly investing legislative power for that purpose in the United States. When the Constitution was adopted, the existing maritime law became the law of the United States 'subject to power in Congress to alter, qualify or supplement it as experience or changing conditions might require.' The Congress thus has paramount power to determine the maritime law which shall prevail throughout the country. But in amending and revising the maritime law, the Congress necessarily acts within a sphere restricted by the concept of the admiralty and maritime jurisdiction.

*THOMAS BARLUM*, 293 U.S. at 43-44 (citations omitted).

---

[3] A mortgage on a ship traditionally was not a maritime contract. *Bogart v. The JOHN JAY*, 58 U.S. (17 How.) 399 (1854).

[4] A contract for the original construction of a vessel is not a maritime contract. *New Bedford Dry Dock Co. v. Purdy*, 258 U.S. 96 (1922).

[5] A contract to sell a vessel is not a maritime contract. *E.g.*, *Magallanes Investment, Inc. v. Circuit Systems, Inc.*, 994 F.2d 1214 (7th Cir. 1993) ("contracts for the sale of a ship are not 'maritime' and thus admiralty jurisdiction does not apply").

As support for its holding that the Ship Mortgage Act of 1920 was constitutional, the
Supreme Court in *THOMAS BARLUM* went on to list eight other occasions when Congress
exerted its admiralty authority, beginning with the Judiciary Act of 1789,[6] *id.* at 44, noting

> Of special significance, in relation to the present question, are the
> Act**s of 1884** and 1910, *supra*. By the former, the **admiralty
> jurisdiction in limitation proceedings was enlarged so as to
> embrace the liability for a nonmaritime tort.** Although the
> damaged structure was on land, the injury was due to the operation
> of the vessel, and it could not be said that the Congress had stepped
> beyond the limits of its authority to amend the law in furthering its
> policy to encourage investments in ships. ***Richardson v. Harmon***,
> *supra*.

*Id*. at 45 (emphasis added).

The Admiralty Extension Act of 1948, 46 U.S.C. § 30101(a), is another example,
providing that admiralty and maritime jurisdiction "extends to and includes all cases of injury or
damage, to person or property, caused by a vessel on navigable waters, even though the injury or
damage is done or consummated on land."

In sum, because Congress can expand admiralty jurisdiction, the inclusion of alleged
nonmaritime torts by Petitioner's recreational vessel limitation case cannot be considered
unconstitutional. And it should also be noted that since the Limitation Act's 1884 amendment
was held by *Richardson* to add nonmaritime torts, Congress has not amended 46 U.S.C §
30505(a) to retract nonmaritime torts as subject to limitation.

### 3.    There is maritime tort jurisdiction.

The United States Supreme Court has explained that in determining whether a tort is
cognizable in admiralty, courts consider the relationship between the tort and a "traditional

---

[6] Now codified at 28 USC §1333.

maritime activity" (the "nexus test"), as well as the situs of the alleged wrong (the "locality test"). *See, e.g, Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995). The locality test determines whether a vessel was "on navigable waters," and the nexus test essentially analyzes whether the alleged tort is maritime in character. These are two separate tests, the concepts of which must not be confused. The central issue here is the locality test, and whether the locality test can be met where a vessel is on blocks, next to the water.

The premise is simple: a ship, in any "dry dock," which is undergoing temporary repairs, will satisfy locality test although out of the water.[7]  The United States Supreme Court established this in 1903, and it remains good law cited by courts to this day.  *See Robert W. Parsons*, 191 U.S. 17, 33-34, 24 S.Ct. 8, 13, 48 L.Ed. 73 (1903); *The Steamship Jefferson,* 215 U.S. 130, 142, 30 S.Ct. 54, 58, 54 L.Ed. 125 (1909); and *Gonsalves v. Morse Dry Dock & Repair Co.,* 266 U.S. 171, 45 S.Ct. 39, 69 L.Ed. 228 (1924)(extending dry dock tort issues to admiralty jurisdiction).  *See also Vasquez v. GMD Shipyard Corp.,* 582 F.3d 293 (2nd Cir. 2009).  The use of a travel lift to bring a vessel out of the water for repairs is essentially the same mechanical act as a dry dock.  *See Exhibit A.  See also Document No. 54-2.*

---

[7] There are various types of dry docks where a vessel invariably will meet the locality test: "(1) A floating dry dock, as its name makes clear, floats on the water, the vessel resting on the bottom  of the dry dock after the water has been removed. (2) A graven dry dock is dug into the land. The vessel floats in but rests on land once the water has been pumped out. (3) Finally there is the marine railway, on which the vessel is drawn out of the water, instead of the water being drawn away from the vessel." *Avondale Marine Ways v. Henderson*, 346 U.S. 366, 367 (1953) (Burton, J., concurring).  "A shiplift type dry dock acts like a large elevator which can be lowered into the water. Once the elevator floor (platform) is lowered below the hull of the vessel, the vessel can be positioned over the platform (which has a cradle to support the hull of the vessel) then the elevator platform and vessel are lifted vertically until the vessel clears the water and underwater body inspection and repairs can be made. Once the repairs are completed, the shiplift is lowered placing the vessel back into the water and then maneuvered free of the shiplift. *Sea Vessel,* 23 F.3d 345, n. 3.  A graving dock is "a permanent structure on land with gates that allow vessels to enter and that then can be closed to drain out the water. In other words, it is a dry dock." *San Francisco Drydock, Inc. v. Dalton*, 131 F.3d 776, 777 (9th Cir. 1997).

**A.**     **Petitioner meets the locality prong because fuel tank repair/replacement at a full service marina on navigable waters does not withdraw a vessel from navigation**

"On navigable waters" is not construed literally, as vessels not "withdrawn from navigation" remain "on navigable waters" for purposes of satisfying the locality prong. *Vasquez v. GMD Shipyard Corp.,* 582 F.3d 293 (2ⁿᵈ Cir. 2009) (locality test analysis focusing primarily on a vessel undergoing repairs in dry dock is still on navigable waters).  A vessel is not "withdrawn from navigation" where it is removed from the water for purposes incidental to the vessel's normal use. As the Second Circuit observed in *Vasquez*, 528 F.3d at 299-300, torts arising from a vessel undergoing repairs in any form of "dry dock" satisfies the locality prong.

The dry dock exception comes from the *Robert W. Parsons*, where the Supreme Court held that a ship undergoing routine maintenance in dry dock is "on navigable waters" because such repairs are considered incidental to a ship's normal operation:

> All injuries suffered by the hulls of vessels below the water line, by collision or stranding, must necessarily be repaired in a dry dock, to prevent the inflow of water, but it has never been supposed, and it is believed the proposition is now for the first time made, that such repairs were made on land. Had the vessel been hauled up by ways upon the land and there repaired a different question might have been presented, as to which we express no opinion; but as all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs.

191 U.S. 17, 33-34 (1903).   The Supreme Court established a vessel is "on navigable waters" where it is out of the water for purposes of repairs incident to normal use.  *See also Simmons v. The Steamship Jefferson*, 215 U.S. 130, 142 (1909) (upholding *The Robert W. Parsons*, explaining vessels maintain admiralty jurisdiction even where the vessel is on dry dock, or has come to rest on dry land due to the ebbing of the time, so long as she is there "for the purposes of

making necessary repairs to fit her for continuance in navigation").[8]

The locality test is an entirely distinct analysis from the nexus test—which was added later, as an *additional* prong to the locality inquiry. It *does not* account for why vessels in dry dock, to this day, will satisfy the <u>locality test</u>. However, *The Robert W. Parsons* does—and it has never been overturned or abrogated. *See Vasquez*, 582 F.3d at 299 ("We have no reason to question the currency of *The Robert W. Parsons* and *The Steamship Jefferson*").

The Supreme Court's reasoning from over a century ago clearly extends to a modern vessel, where routine maintenance takes it out of the water and onto blocks.  The Second Circuit continues to hold that a vessel out of the water undergoing repairs would give rise to admiralty jurisdiction.  Comparing and contrasting two cases to the case at bar.  In *Vasquez,* the vessel was out of the water for a refit.  As of August 14, 2009 – in the heart of the summer - the *Carter* vessel had already been in storage for 10 months.  The *Carter* decision does not talk about that vessel undergoing any maintenance.  Petitioner's Vessel was only due to be only undergoing repairs for a total of two weeks.  *Vasquez* clearly stands for admiralty jurisdiction while the *Carter* case does not, at least on the facts of that case.

In 1979, finding admiralty jurisdiction over recreational vessels ashore, the Fifth Circuit in *American Eastern Development Corp. v. Everglades Marina, Inc.* prudently observed that admiralty principles should be viewed through the modern lens.[9] 608 F.2d 123, 125 (5th Cir. 1979)[10] ("Admiralty jurisdiction has, in the past, changed as 'new conditions give rise to new

---

[8] Both *The Robert W. Parsons* and *The Steamship Jefferson* involved suits in contract. In *Gonsalves v. Morse Dry Dock & Repair Co*., however, the Supreme Court applied the aforementioned principle articulated in *The Robert W. Parsons* to suits in tort. 266 U.S. 171 (1924) (recognizing that a vessel in a floating dry dock is on water, not on land, for purposes of admiralty tort jurisdiction).

[9] The Court in *American Eastern* analyzed admiralty tort jurisdiction because it involved both contract and tort claims—there is no reason to analyze maritime locality in the absence of an alleged tort.

conceptions' of maritime concerns") (citing *Detroit Trust Co. v. The Thomas Barlum*, 293 U.S. 21, 52 (1934); *see also Exec. Jet Aviation v. City of Cleveland*, 409 U.S. 249, 269-70 (1972) ("The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go").  The *American Eastern* Court held petitioners' vessels, though situated on  dry storage racks, were not "withdrawn from navigation" because their pattern of use indicated they were typically kept in such fashion *incident to their normal use*. *Id.* 124-25. It observed the vessels were only temporarily in dry conditions at a water-side marina, readily accessible to the water just feet from the water's edge when a fire occurred. *Id*. It also explained although the vessels were out of the water, the purpose of dry storage for pleasure craft is to ***obviate the need for traditional wet docking and attendant costs of maintenance***. *Id.*  Relying on the *Robert W. Parsons*, the Court concluded that removing a pleasure boat from the water does not withdraw it from navigation:

> In recent years, many pleasure boaters who frequently take their boats in and out of the water, as appellees here did, have come to regard dry storage at water-side marinas, from which the boats may be readily taken in and out, as an alternative to tying their boats up at docks or moorings. The boat is readily accessible to  the water and can be quickly and easily launched or brought ashore to the storage shed, but it is not exposed to deteriorating effects of water and weather. Moreover, in determining whether a vessel has been withdrawn from navigation, one must look at its pattern of use. Pleasure boats are often tied up a higher proportion of the time than commercial vessels, which typically may spend little time in port. Here, the boats in question were used no less than necessary or appropriate for pleasure craft, and the dry storage, incident to regular use, was a substitute for wet mooring or docking.

*Id*. at 124-25 (emphasis added).  The travel lift depicted in Document No. 54-2 shows a vessel in its slings.  The travel lift "pit" or "bay" is between the docks.  The travel lift drives out on rails that are supported by the dock to pick up or lower the vessel.

The cases Claimant uses to support their arguments are a mix of factually distinguishable

and are not binding on this Court, and ultimately lend credence to Petitioner's point that the locality prong is not so one-dimensional.  The cases relied upon also emphasize a markedly different length of time, much longer than the two weeks promised to Petitioner.  *David Wright Charter Service v. Wright*, 925 F.2d 783 (4th Cir. 1991)(lack of admiralty jurisdiction as ship was out of the water for **five months** (not two weeks) after the ship was placed on blocks 75 feet from the water).  *Omaha Indemnity Co. v. Whaleneck Harbor Marina, Inc.,* 610 F.Supp. 154 (E.D.N.Y. 1985)(Vessel was **in storage** (not repairs) for the season on dry land).  *Latin American Property & Cas. Ins. Co. v. Hi-Lift Marina, Inc.,* 887 F.2d 1477 (1989)(Insurance subrogation action against marina that caused fire in **dry storage** facility).  *Florio v. Olson*, 129 F.3d 678, 680 (1st. Cir. 1997)(Line handler who was injured in a dry dock, the vessel was only peripherally involved).  *In Re Carter,* 743 F.Supp.2d 103, 107 (D.Conn. 2010)("this case **involves storage of a vessel on land for a period of ten months**, not temporary storage of a vessel in a graving dock.").  *Lewis Charters, Inc. v. Huckins Yacht Corporation*, 871 F.2d 1046 (11th Cir. 1989)(**boat was stored as opposed to being actively repaired**).

> **B. The nexus prong is met because (1) the maritime character of vessel maintenance is obvious, and (2) a vessel fire at a full-service marina has clear potential to spread to neighboring yachts.**

The nexus test involves two parts: (1) whether a "substantial relationship" exists between the activity giving rise to the incident and a traditional maritime activity, and (2) looking to the general features of the incident, whether such an event could cause a "potentially disruptive impact on maritime commerce." *Vasquez*, 582 F.3d 299-300 (2nd Cir. 2004), *citing Sisson v. Ruby*, 497 U.S. 358, 362 (1990). The "substantial relationship" prong is satisfied because vessel repairs at a marina unquestionably bear a significant relationship to a traditional maritime activity. *Sisson v. Ruby*, 497 U.S. 358, 367 (1990) (the storage and maintenance of a vessel at a

marina is substantially related to "traditional maritime activity") *see also Vasquez*, 582 F.3d at 300 (Following *Sisson* stated "the general conduct in this case is the repair and maintenance of a vessel, just as obviously an 'indispensable' and 'traditional' maritime activity.").

Claimant contends, however, that a fire, merely because it occurred on land could not have had a potentially disruptive impact on maritime commerce. The Supreme Court's opinion in *Sisson* illustrates that Claimant's suggested view is far too narrow in this respect. 497 U.S. 380.  In that case, where a vessel caught ablaze at a marina, spreading the fire to neighboring vessels, the Court explained: "This case involves a fire that began on a noncommercial vessel at a marina located on a navigable waterway. Certainly, such a fire has a potentially disruptive impact on maritime commerce, as it can spread to nearby commercial vessels or make the marina inaccessible to such vessels." *Id*. at 362.   The destruction of the entire Yard is of course disruptive to other vessels that need repairs.

Thus, even if a vessel were to be located on land, there would be no doubt such a fire could easily spread to neighboring vessels situated on of the navigable waterway adjacent to Yard.  A fire on a vessel at the Yard is no exception—nexus is clearly satisfied where a vessel is undergoing repairs at a highly trafficked marina on navigable waters.  Indeed, the only saving grace that the fire did not spread to the vessels on the water was the wind direction which can be seen in these videos.  Had the winds been different, there would have been a disruption to maritime commerce in that the fire would have spread to the Vessels in the marina. However, the video also shows Vessel being towed from their respective berths in part to keep them safe, but also to afford rescue vessels access to apply water to the fire.  Those two rescue vessels performing that service took them away from providing those types of services to other vessels. Additionally, those vessels technically have a lien for salvage against the Petitoner's Vessel.

*See The Steamship Jefferson*, 30 S.Ct. 54, 210 AMC 2987 (1909).

There is simply no question as to the traditional maritime character or impact on commerce here, and as both prongs are met, Petitioner has perfected admiralty jurisdiction.

**4.    There is admiralty jurisdiction besides maritime tort.**

The Vessel did not need to be removed from the water to be repaired.  *See Exhibit A.*  The Yard took it upon itself to do so for a repair that was promised to take no longer than two weeks.  *Id.*  The fire that occurred was a direct result of breach of the implied warranty of workmanlike performance on the part of the Yard.  Such a claim sounds in admiralty.  *See Boston Ship Repair LLC v. Starr Indemn And Liability Co.,* 997 F.Supp.2d 118 (2014).[11]  The Limitation Act allows a vessel owner to limit any claim and to any loss or damage done without the privity or knowledge of the owner.  *See* 46 USC §30505.  To the extent that the Court determines that there needs to be some other basis, the facts of the Verified Complaint set forth the facts that work was being performed by the Yard to make the repair to the fuel tank and that the fire occurred while the Petitioner was not present.  The Counterclaim setforth more specifically the basis for admiralty jurisdiction.

Claimants may argue that the personal contract doctrine would bar this type of jurisdictional assertion on an owner's limitation claim.  Such an argument is misplaced.  The First Circuit said:

> "In application this is an equitable doctrine based on the proposition that a shipowner should not be able to promise an undertaking or performance that was within his personal control and then turn around and limit liability when his performance was faulty." 2 Schoenbaum, *supra,* § 15–8, at 318; *see Richardson,* 222 U.S. at 106, 32 S.Ct. 27. "[T]he test of the personal contract

---

[11] Petitioner's assertion of admiralty jurisdiction for a limitation action based in contract is not new.  *See Sea Vessel, Inc. v. Reyes,* 23 F.3d 345, n. 4(1994) ("Sea Vessel contends, on appeal, that its repair contract with Miami Shipyards, a maritime contract, serves as an alternative basis for admiralty jurisdiction. Because we conclude that Sea Vessel's complaint is cognizable in admiralty based on a maritime tort, we do not address this contention.")

> exception is not merely that the shipowner entered into the contract
> personally, but is whether the obligation (and therefore the breach)
> was one the shipowner was personally bound to perform, rather
> than one contemplated he would delegate to his agents and
> servants." 2 Schoenbaum, *supra,* § 15–8, at 318.

*Mediterranean Shipping Co. S.A. Geneva v. POL-Atlantic,* 229 F.3d 397, 403 (2000).  Clearly, the Yard had full control of the Vessel and how to perform the work rather than Petitioner.  Any such argument would be misplaced.

### 5.       Claimants Ignore the Benefits of Concursus in the District of Massachusetts

Petitioner had every right to file his Limitation Complaint in the District of Massachusetts under the Constitution, Art. III; 28 U.S.C. § 1333(1); 46 U.S.C. § 30511(a) ("The owner of a vessel may bring a civil action in a district court of the United States for limitation of liability under this chapter"); and Fed. R. Civ. P. Supp. F(1). Similarly, Petitioner had every right to designate it as an Admiralty or Maritime Claim without a jury under Fed. R. Civ. P. 9(h) and 38(e).

The District of Massachusetts is the most experienced and qualified forum to efficiently and economically adjudicate this complicated, multi-tortfeasor, multi-claimant maritime casualty in one "concursus." Regarding admiralty limitation actions, "[t]he heart of this system is a concursus of all claims to ensure the prompt and economical disposition of controversies. . . ." *Maryland Cas. Co. v. Cushing*, 347 U.S. 409, 415 (1954); *see also In re Urbelis*, 2018 WL 701350, *6 (D. Mass. 2018) ("limitation proceedings following a marine disaster will certainly expedite matters by getting all the parties concerned involved in a single proceeding"); *Nagler*, 246 F.Supp.3d 656 n.8 ("a *concursus* is a proceeding to marshal all claims, or bring them into concourse, and settle all disputes in one action…").

A concursus in this Court, with federal court procedures and scheduling imposed and maritime law knowingly applied, is the best place to effectively litigate this marine casualty.

## IV.    CONCLUSION

The Yard warranted its repair of Petitioner's Vessel would be workmanlike but the Yard breached its obligation to Petitioner and all the other destroyed property owners.  Petitioner did nothing wrong and had no knowledge of Yard's wrongs, which by using a power saw instead of handsaw sparked the fire.  Petitioner should indeed be entitled to exoneration or limitation under the Shipowners Limitation of Liability Act because he had no privity or knowledge of the Yard's maritime tort, breach of contract and unworkmanlike repair of his vessel.  Finally, there is jurisdiction over the Petitioner's counterclaims.

Respectfully submitted
Plaintiff
By its attorney,

/s/ David S. Smith
David S. Smith, Esq.
BBO No.: 634865
Farrell Smith O'Connell
Aarsheim Aprans, LLP
27 Congress St., Suite 109
Salem, Massachusetts 01970
Tel: 978-744-8918
Fax: 978-666-0383
dsmith@fsofirm.com

### CERTIFICATE OF SERVICE

I hereby certify that I caused a true copy of the foregoing document to be served on all counsel of record through the ECF system and via regular mail postage prepaid this 2nd day of March, 2023 upon the following parties:

Eric L. Velte
52 Cambridge Avenue
Haddon Township, NJ 08108

Geoffrey C. Smith
343 Tappan Street, Apartment 5
Brookline, MA 02445

Gerald Monchik
7 Stony Brook Dr
Mashpee, MA 02649

Gregory E. Kelsey
67 Ocean Drive
Mattapoisett, MA 02739

James Worley Lopez
704 Hiporomo
Apt 2-B
Santurce, 00909
PR

Jane Hiller Farran
8434 Ardleigh Street
Philadelphia, PA 19118

Jason R Dubreuil
17 Bishop Road
Rochester, MA 02770

Robert Wironen
26 Washington Street
Tyngsborough, MA 01879

Steven M Cadieux, Jr
47 Boston Hill Rd
Fairhaven, MA 02719

William N. Farran, III
8434 Ardleigh Street
Philadelphia, PA 19118

By: */s/ David S. Smith*